UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **Comcast of Massachusetts/New Hampshire/Ohio, Inc.** | ) | Case No.: **1:04-cv-10423-RWZ** |
| | ) | |
| Plaintiff, | ) | **AFFIDAVIT OF** |
| | ) | **MARK MONDALTO** |
| vs. | ) | |
| | ) | |
| **Robert Dion** | ) | |
| | ) | |
| Defendant | | |

Now comes the affiant, and makes this his sworn statement, under the pains and penalties of perjury, of his own personal knowledge.

1. My name is Mark Mondalto.

2. I am employed by Comcast as an Area Piracy Specialist. I also worked in a similar position for Comcast's predecessor in interest.

3. In the interests of simplicity, throughout this affidavit I will refer to Comcast of Massachusetts/New Hampshire/Ohio, Inc. and/or its predecessor in interest as "Comcast".

4. I am familiar with and I have reviewed the business records of Comcast associated with the Defendant, Robert Dion.

5. I have been trained by Comcast and I have been in my position or a similar position to this for a number of years. Through this training and experience I have become familiar with:

   a. Comcast's encryption and security system;

   b. Unauthorized methods of descrambling Comcast's scrambled signals;

    c. Black market devices used to enable unauthorized descrambling; and

    d. The methodology of testing devices to determine if such devices are capable of the unauthorized interception of signals.

6. In order to protect its signals and maintain the value of its services, Comcast encrypted and/or scrambled, in an analog fashion, some of its signals so that the signals would have to first be decoded by electronic decoding equipment in order to be viewed clearly on a television receiver. Take note that throughout this affidavit I am referring to analog scrambling and descrambling as that was the predominant method of scrambling used at the time pertinent to this case. Today most scrambling is done in a digital manner.

7. Comcast utilized analog encryption to encrypt and/or scramble signals for premium channels, such as HBO, Showtime, and Cinemax, for which subscribers would have paid a separate monthly subscription fee, and for pay-per-view events, such as a pay-per-view movies, adult pay-per-view offerings and special event pay-per-view offerings, for which subscribers would have paid a specific one time charge to view each pay-per-view signal.

8. Comcast issued/leased to most of their subscribers devices which were analog addressable converters/descramblers. These devices converted signals for older televisions that are not "cable ready" and they descrambled analog signals based upon the instructions that the cable company sends to the addressable converter/descrambler. The crucial element of the addressable converter/descrambler was that it was "addressable". That meant the cable company

could "address" (give instructions to) the descrambler. "Addressability" refers to the descrambler's ability

to descramble signals based *only* upon the instructions that it receives from the cable company.

9. Certain devices, commonly known and hereinafter refer to as "black boxes" are unauthorized, **non-addressable** descrambling devices. Black boxes are capable of defeating Comcast's analog encoding and scrambling technology such that the black boxes will descramble scrambled signals (including premium channels and pay-per-view events) whether the individual has paid to receive the signal or not. Black boxes will not take instructions regarding what the user is authorized to receive; they cannot be "addressed." There is no legitimate use for a black box.

10. Take note of the fact that an individual in possession of a black box or other unauthorized descrambling device would still need to purchase some cable television signals from Comcast in order to allow the scrambled signals to enter the home and thereafter be covertly descrambled.

11. Take note of the fact that a black box simply descrambles the scrambled analog channels with out authorization; it does not pull in the non-scrambled stations from the telephone pole. The non-premium cable television stations (e.g. MTV, The History Channel, etc.) are offered to subscribers in groupings of channels ("tiers"). These channels are either delivered in groups to the subscriber in a non-scrambled fashion or they are simply not delivered into the home at all. This explains why an individual with a black box might still be paying a significant amount to the cable television company while utilizing a descrambler to descramble the premium

channels. If an individual with a black box wanted access to *all* stations that individual would still have to pay to have all the non-scrambled stations to come into the home. The Individual could then use the "black box" to descramble the premiums stations and pay-per-view signals.

12. Comcast received information that on or about March 2, 2001, a "cool box" was purchased by the Defendant from Blast Marketing.

13. A "cool box" was a black box capable of descrambling Comcast's scrambled analog signals including premium channels and pay-per-view channels.

14. An analog black box would be of little or no use after approximately March of 2005. At that point most of the encryption used by Comcast in the subject area was digital, and to the best of my knowledge this black box could not descramble digital signals.

15. Based upon the fact that the Defendant's account history reveals that he never ordered premium channels or pay-per-view signals while in possession of the "black box", it is reasonable to infer that the device was used from March 2001 until approximately March of 2005. Accordingly, it is clearly possible that the duration of the unauthorized interception could be as high as approximately 48 months. I shall hereinafter refer to this 48 month period as the "pertinent time period".

16. During the pertinent time period, through the use of the black box the Defendant would have had access to scrambled premium channels and scrambled pay-per-view signals while only paying for a level of tiered, non-scrambled programming.

17. While the charges for and numbers of the premium channels that would have been available to the Defendant through the use of the device varied significantly during the pertinent time period, taking into account the length of time and the variations in

price it is reasonable to state that estimated price for the premium channels covertly available to the Defendant were *on average* was $65.00 per month. This $65.00 figure represents the value of the premium channels the Defendant had access to over and above the tiered, non-scrambled non premium stations the Defendant was actually paying for.

18. During the pertinent time period, the charge for and the number of pay per view movies, adult pay per view offerings, and special event pay per view offerings (e.g.; boxing or wrestling match) that were accessible to the Defendant through the use of the device varied significantly but taking into account the length of time and the variations in price it is reasonable to state that an estimated price *on average* was:

    a. $3.95 per pay-per-view movie and there were numerous movies offered per month;

    b. $8.00 per adult pay-per-view offerings and there were numerous offerings per month;

    c. $30.00 per special event and, on average there was at least one special event per month

19. Also of assistance in calculating the amount of unauthorized interception is the fact that Comcast did a detailed analysis of its legitimate, paying subscribers in a similar New England franchise as to their pay-per-view purchasing in the month of February, 2003. This analysis showed that a statistically significant number (.17%) of its legitimate, paying, high-end purchasers purchased fourteen (14) or more pay-per-view movies during that particular month.

20. If legitimate, high end, paying subscribers of Comcast purchase fourteen or more pay-per-view movies in a given month it can be inferred that individuals like the Defendant, utilizing a descrambler without any concern for costs, would also view at least as many pay-per-view movies as the legitimate high end paying subscribers of Comcast. It can also be inferred that that individuals like the Defendant, utilizing a descrambler without any concern for costs, would make a significant number of purchases of the more expensive adult offerings in addition to or in lieu of the less expensive pay-per-view movies.

Subscribed and sworn to, under the pains and penalties of perjury, this 13th day of January, 2006.

*[signature]*
Mark Mondalto