# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **Comcast of Massachusett/New Hampshire/Ohio, Inc.** )<br><br>        Plaintiff,        )<br><br>        vs.        )<br><br>**Robert Dion**        )<br><br>        Defendant | Case No.: **1:04-cv-10423-RWZ**<br><br>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT** |

## I. Liability

**1.      Procedural history**

The Plaintiff filed a Complaint in this action on March 3, 2004. The Defendant was served by service at his last and usual address with copies of the Complaint, Summons and other pertinent documentation on April 7, 2004. Thereafter, the Defendant failed to appear in this action. On June 24, 2004 the Plaintiff requested Default to be entered against the Defendant. On September 27, 2005 Default was entered against the Defendant in this action. The Plaintiff has now moved for Default Judgment against the Defendant.

**2.      The Plaintiff's Analog Scrambling System, Pirate Technology and the Well Pled Facts Deemed Proven Upon Default**

The Default already entered in this action against the Defendant is similar to a finding of liability against the Defendant. See, *Almedia v. Secretary of Health Education of Welfare*, 622 F. 2d 1044 (1st Circuit 1980). Accordingly, based upon the Default that has already

1

entered against the Defendant, the Plaintiff has proven certain pertinent facts. Additionally, Plaintiff has submitted an Affidavit of the Plaintiff's technician wherein the technician explains the technology involved in this matter.  Wherefore the Plaintiff contends that the facts proven by Default and further explained in the technician's uncontroverted affidavit are as follows:

    a.   The Plaintiff has the legal franchise to sell cable television services in the Defendant's area

    b.   In order to protect its signals and maintain the value of its services, the  Plaintiff encrypted and/or scrambled, in an analog fashion, some of its signals (premium channels and pay-per-view offerings) so that the signals would first have to have been decoded by Plaintiff-issued electronic decoding equipment in order to be viewed clearly on a television receiver;

    c.   Analog scrambling descrambling was the predominant method of scrambling used at the time pertinent to this case.  Today most scrambling is done in a digital manner;

    d.   The Plaintiff utilized analog encryption to encrypt and/or scramble signals for premium channels, such as HBO, Showtime, and Cinemax, for which subscribers would have paid a separate monthly subscription fee, and for pay-per-view events, such as pay-per-view movies, adult pay-per-view offerings and special event pay-per-view offerings, for which subscribers would have paid a specific one time charge to view each pay-per-view signal.

    e.   The Plaintiff issued/leased to most of its subscribers a device called an analog "addressable converter/descrambler".  These devices converted signals for older

2

televisions that were not "cable ready" and they descrambled analog signals based upon the instructions that the cable company sends to the addressable converter/descrambler. The crucial element of the addressable converter/descrambler was that it was "addressable". That meant the cable company could "address" (give instructions to) the descrambler. "Addressability" refers to the descrambler's ability to descramble signals based *only* upon the instructions that it receives from the cable company.

f.  Certain devices, commonly known as "black boxes" are actually unauthorized non-addressable descrambling devices. Black boxes are capable of defeating Comcast's encoding and scrambling technology in that the black boxes will descramble all signals (including premium channels and pay-per-view events) whether the individual has paid to receive the signal or not. Black boxes will not take instructions regarding what the user is authorized to receive; they cannot be "addressed."

g.  An individual in possession black box would still need to purchase some cable television signals from Comcast in order to allow the scrambled signals to enter the home and thereafter be covertly descrambled.

h.  Additionally, the non-premium cable television stations (e.g. basic cable) are offered to subscribers in groupings of channels ("tiers"). These channels are either delivered in groups to the subscriber in a non-scrambled fashion or they are simply not delivered into the home at all. This also explains why an individual with a descrambling device might still be paying a significant amount to the cable television company while utilizing a descrambler to descramble the premium channels. If an individual with a black box wanted access to *all* stations, that

3

individual would still have to pay to have all the non-scrambled stations to come into the home. The Individual could then use the black box to descramble the premium stations and pay-per-view signals.

i. On or about March 2, 2001, a "cool box" black box was purchased by the Defendant from Blast Marketing.

j. On or after March 02, 2001 the defendant utilized the subject black box to descramble Plaintiff's scrambled cable television signals thereby gaining unauthorized access to the plaintiff's premium channels and pay-per-view offerings without payment to the Plaintiff.

k. The Defendant knowingly and willfully violated Title 47 U.S.C. § 553;

l. Based upon the fact that the Defendant's account history reveals that he never ordered premium channels or pay-per-view signals while in possession of the "black box", it is reasonable to infer that the device was used from March 2001 until approximately March of 2005. Accordingly, it is clearly possible that the duration of the unauthorized interception could be as high as approximately 48 months.

## 3.    Analogous Case Law

The Plaintiff has moved for Default judgment pursuant to 47 U.S.C. § 553, a provision of Title 47 that prohibits the unauthorized interception of television signals from a cable television system. The telecommunications provisions of the United States Code also contain the provision, 47 U.S.C. § 605, which prohibits the unauthorized utilization of interstate radio-originated communications. Section 605 is extremely similar to 47 U.S.C. § 553.

Both provisions essentially bar the unauthorized interception of television signals.

Also, the statutory damage provisions for non-commercial defendants in § 605 and § 553 are extremely similar.  In fact, the Second Circuit has held that where there is an unauthorized interception of signals from a coaxial cable, and the signals intercepted from the cable include interstate radio-originated communications, both §605 and §553 are violated.  See *International Cablevision, Inc. v. Sykes* ("Sykes I"), 997 F. 2d 998, 1007 (2d Cir. 1993); *International Cablevision, Inc. v. Sykes* ("Sykes II"), 75 F.3d 123, 131 n.4 (2d Cir. 1996); but see  *Charter v Burdulis* 367 F.Supp.2d 16 (D. Mass 2005).  In any event, even if § 605 might not apply for unauthorized cable television violations in the District of Massachusetts the cases decided pursuant to 47 U.S.C. § 605 are, at least, analogous or similar to §553 cases. Accordingly, the Plaintiff will make citations to § 605 cases simply as persuasive authority.

Also, in some of the cases cited in this Memorandum, the defendants were using non-addressable descrambling devices that were created by covertly modifying a cable television companies own converter/descrambler to covertly descramble all of the cable company's signals.  These cases are essentially cases where the defendants were utilizing homemade black boxes.  These homemade black box cases are analogous to the claims in this Civil Action.  Additionally, the Plaintiff cites to satellite television cases in this Memorandum wherein the defendants utilized satellite de-scrambling devices that are also similarly analogous to the homemade black box utilized by the Defendant in this Civil Action.

### 4.    The Plaintiff's Case without the Default

Even without the Defendant's Default, the Plaintiff still has a strong case against the Defendant.  Possession of a television descrambling device is sufficient evidence from which a trier of fact could infer that the device was used to descramble the Plaintiffs television signals. See. *DirecTV. v. Miller*, Case no 6:03-cv-1027-Orl-19KRS (a copy of the unpublished case is attached hereto as "**Exhibit A**"). In the Miller case, the plaintiff,

DIRECTV, had evidence that the defendant possessed a satellite television descrambling device called an "unlooper". The defendant in the *Miller* case moved for Summary Judgment against DIRECTV contending that DIRECTV lacked the necessary "direct evidence" such as eyewitness testimony or videotape of some wrongdoing and the defendant denied using the "unlooper".  The Court rejected this argument stating:

> A reasonable jury could conclude that the defendant illegally stole DirecTV's programming.  Based on their life experience, a jury could reasonably assume that people only buy electronic equipment such as televisions, computers, or (in the case of Defendant) satellite piracy unloopers when they plan to use such equipment.  It would be a strange world, after all, if people regularly bought such equipment and then put it in the closet to collect dust. *Id* at 7

Similarly, in this civil action the Plaintiff contends that a reasonable jury could infer that where the Defendant purchased a black box the Defendant, with such a device then in his possession, would, quite reasonably, go on to utilize the device for the unauthorized interception of the Plaintiff's signals.

Moreover, the Defendant's actual possession of a television descrambling device leads to the reasonable inference that the device was used to descramble.  In *Community Television Systems, Inc. v. Caruso*, 134 F. Supp. 2d 455 (D. Conn. 2000), *aff'd*, 224 F.2d 430 (2d Cir. 2002), there was evidence that the defendants purchased and installed cable television de-scramblers (black boxes) that would allow them to illegally view the plaintiff's cable television programming.  *Id* At 456.  Although there was no so-called "direct" evidence that the defendants had ever actually used the devices the court, nonetheless, found the defendants liable for using the devices.  After noting that the defendants had engaged in the transactions of obtaining descrambling devices from a distributor named "Radil" the court said:

> Based on the record here, the most reasonable inference is that each such

transaction was engaged in with Radil so the descrambler could be used for its intended purpose, namely to receive cable services over TCI's system; there is no evidence of non-use or any other use. Thus, the court concludes that each of the named defendants used and benefited financially from the descrambler sold by Radil, commencing in 1992 *Id*. at 460.

The Second Circuit affirmed the pertinent elements of the Connecticut District Court's liability decision in the *Caruso* case. In fact, the Second Circuit stated that the purchase and installation evidence was **"*at least*"** enough evidence for a rebuttable presumption of use. The court said:

> "In the pending case, the seller's computer records showed the names of [the defendants] and the devices were installed in their home. That evidence suffices to create ***at least*** a rebuttable presumption that each of them is liable." *Community Television Systems, Inc. v. Caruso*, 284 F.3d 430, at 432 (2nd Cir. 2002) (emphasis added).

Similarly, in this Civil Action the Plaintiff contends that there is evidence that the Defendant at least possessed a descrambling device, the black box purchased by the Defendant. From this evidence it can be inferred, or possibly even presumed, that the device was used to descramble the Plaintiff's scrambled signals.

Additionally, the Fifth Circuit recently found that where an individual purchased a satellite descrambling device and where that individual had the necessary satellite dish to bring signals into his home, unauthorized interception of signals could be inferred. See *DIRECTV Inc. v. Minor,* 420 F.3d 546 (CA 5 (Tex) 2005). Similarly, in this Civil Action the Plaintiff contends that there is evidence that the Defendant possessed a descrambling device and that there were scrambled signals going into the Defendant's home due to the fact that the Defendant maintained a cable television account with the Plaintiff.

**5.     The Plaintiff's Liability for Violations of 47 U.S.C. § 553(a)**

Based upon the facts determined by the Defendant's Default to the Plaintiff's pleadings, as further explained by the Plaintiffs technician, the Defendant is now liable to the Plaintiff for willful violations of Title 47 U.S.C. § 553(a). Specifically, the Defendant's actions violated §553(a)(1), which provides:

> **No person shall intercept or receive or assist in intercepting or receiving any communications services offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law.**

## II.    Damages

**1.    Damage Provisions and Remedy Provisions in Title 47 U.S.C. § 553(c)**

Title 47 U.S.C. §553(c) provides civil damages and remedies to an aggrieved party from Defendants who have violated the above referenced §553(a)(1). Various subsections of § 553 (c) provide:

1.    The Court may grant a final injunction to prevent further violations of §553 (a)(1) pursuant to 47 U.S.C. § 553 (c)(2)(A);

2.    The Court may grant recovery of full costs including awarding reasonable attorney's fees to the aggrieved party who prevails pursuant to 47 U.S.C. 553(c)(2)(C); and

3.    The Court may award actual damages or the Court may, at the Plaintiff's election, award statutory damages in a sum of not less than $250.00 or more than $10,000.00 as the court considers just, pursuant 47 U.S.C. § 553(c)(3)(A)(ii).

4.    The court can increase the statutory damage award by up to $50,000.00 if the violations of §553 (a) were willful and for private financial gain pursuant

8

to 47 U.S.C. § 553(c)(3)(B).


**2.      The Assessment of Statutory Damages**

Although 47 U.S.C. §553(c) provides little guidance on the assessment of statutory

damages, courts have used a variety of methods when assessing statutory damages including:

**(a) Estimating per month Actual Damages by the Reasonable Inferences Method**

At least two of the Federal Judges in this District have found that a primary factor to

consider when assessing statutory damages is the estimate of actual damages. See *Comcast v*

*Naranjo* 303 F. Supp. 2d 43 (D. Mass 2004) and *Charter v Burdulis* 367 F.Supp.2d 16 (D.

Mass 2005).   In the case of *Comcast v Naranjo* 303 F. Supp. 2d 43 (D. Mass 2004) the

Massachusetts Federal District Court estimated damages from the use of a modified

converter/descrambler by making *reasonable inferences* of the amount of use of the device by

the Defendant in that case.

The *Naranjo* Court found that where an individual had access to all premium stations

and all pay-per-view offerings it was reasonable to infer damages per month based upon:

a.   The cost of the premium channels the defendant had unauthorized access to each
        month;

b.   Ten (10) pay-per-view movies each month; and

c.    Four (4) of the more expensive pay-per-view offerings.

This method for estimating actual damages was recently followed in the *Burdulis* case

except that the *Burdulis* Court then went on to assess further damages (see below).   Using the

reasonable inference method with the pertinent prices as set fourth in the Plaintiff's

technician's affidavit the per-month damage would be $136.50.

9

**(b) Estimating per month Actual Damages, by the High-End Purchaser Method**

While the court can clearly estimate actual damages based upon the reasonable inferences method set forth in the *Naranjo* and *Burdulis* cases, Comcast has offered actual data from which the amount of unauthorized interception by the defendant could be more empirically estimated. Specifically, by affidavit the Plaintiff has asserted that Comcast did an analysis of its legitimate, paying, high-end, legal subscribers (it's *High-End Purchasers*) in this region as to their pay-per-view purchasing in the month of February, 2003. This analysis showed that a statistically significant number (.17%) of its legitimate, paying, high-end purchasers purchased fourteen (14) or more pay-per-view movies during that particular month.

Based upon these statistics, the Plaintiff asserts that if its high-end, legitimate, *paying, legal customers* purchase as many as fourteen or more paper views per month, it is clearly reasonable to infer that an individual, like the Defendant, when utilizing a descrambler would obtain at least as many pay-per-view movies per month, fourteen (14), as Comcast's legitimate high-end purchasers.

In fact, the Plaintiff asserts that this figure is a low estimate. The Defendant utilizing a descrambler would never have to consider costs. In such a case the Defendant could easily view more pay-per-view movies than the high-end purchaser and the Defendant would be more inclined to purchase the more expensive pay-per-view offerings and special events.

Using the high-end purchaser method with the pertinent prices as set fourth in Comcast's technician's affidavit the per-month damage would be $120.30.

**(c). Estimate of the Number of Months of Unauthorized Interception.**

The court in the *Naranjo* case found that the estimated duration of the unauthorized interception began at the time when the defendant had possession of the subject

device *and* last paid for scrambled programming.  Based upon the fact that the Defendant's account history reveals that he never ordered premium channels or pay-per-view signals while in possession of the "black box", it is reasonable to infer that the device was used from March 2001 until approximately March of 2005. By March, 2005 many, if not all, of the premiums signals and pay-per-view signals were being encrypted digitally.  It does not appear that this black box could decrypt digitally encrypted signals.  Therefore, absent any other evidence (including evidence from or about the Defendant) it can be inferred that the duration of the unauthorized interception was 48 months.

**(d.) Conclusion as to estimates of actual damages**

By using either the *reasonable inference* method of calculating monthly damages ($136.50) and by then applying the monthly damage amount to the number of months of inferred unauthorized interception (48 months) we would achieve an estimated actual damage number of $6,552.00. Utilizing the *high end purchaser* method ($120.30 per month) we would achieve an estimated actual damage number of $5,774.40.

**3.    Assessing Additional Damages as a form of Deterrence.**

There have been at least three separate cases where courts have *specifically added baseline statutory damages for the purpose of deterrence*.  See *Time Warner v Domsky*, No. 96 Civ. 6851, 1997 U.S. Dist. LEXIS 13505 (S.D.N.Y. Sept. 2, 1997) (a copy of the unpublished decision is attached hereto as **"Exhibit B"**), *DIRECTV v Getchel* 2004 WL 1202717 (D. Conn. 2004) (a copy of the unpublished decision is attached hereto as **"Exhibit C"**) and *Cablevision v Collins* 2004 WL 1490307 (S.D.N.Y. 2004) (a copy of the unpublished decision is attached hereto as **"Exhibit D"**).

The court in the *Domsky* case clearly set forth the deterrence reasoning when, after estimating the damage in a manner similar to *Naranjo* it said:

While I find these amounts reasonably approximate the lost revenue from the use of a pirate box, it would not be sufficient deterrence if the damages payable by a violator were limited to the value of the stolen services. There would be no incentive to cease the violation if the penalty were merely the amount that should have been paid. *Id* at 18

The *Domsky* court then went on to double its estimate of damages as a form of deterrence when assessing the statutory damages. This reasoning was recently explicitly followed in the *Collins* case where that court also doubled its estimate of damages as a form of deterrence when assessing statutory damages.

The Connecticut Federal District Court recently considered deterrence when assessing statutory damages for the unauthorized interception of television signals in the case of *DIRECTV v Getchel*, 2004 WL 1202717 (D. Conn. 2004). The court in the *Getchel case* cited to the case of *Cable/Home Communications corp. v. Network Productions, Inc.*, 902 F. 2d 829, 852 (11th cir. 1990) for the proposition that;

> In its broad discretion for determining statutory damages, the district court should consider both the willfulness of the defendant's conduct and the deterrent value of the sanction imposed. *Getchel* at 3.

The *Getchel* court then went on to assess statutory damages above the statutory minimum finding that the minimum would "have no deterrent effect". *Getchel* at 3.

Following the line of reasoning set forth in these cases, this Court should assess statutory damages above any estimate of actual damages. Based upon the estimate actual damages a doubling of that number would be reasonable to act as a deterrent.

12

**4. Assessing additional damages, over and above an estimate of actual damages, pursuant to the exemplary damages provision of the statute, 47 U.S.C. § 553(c)(3)(B),  based upon the willfulness and private financial gain of the defendant.**

Recently the Massachusetts Federal District Court has found that 47 U.S.C. § 553(c)(3)(B) empowers a court will increase damages, over and above an estimate of actual damages,  where the violation was willful and for the private financial gain of the defendant; most importantly, the  court found that where a residential defendant willfully used a descrambler to avoid paying bills that was a willful "private financial gain" See *Charter v Burdulis* 367 F.Supp.2d 16 (D. Mass 2005) and *Comcast v Doucette* CA NO, 03-11779-REK (D. Mass 2005) (**Exhibit E**). Similar reasoning can also be found in a New York Federal District Court case.  See *Cablevision v Lokshin*, 980 F. Supp. 107 (E.D.N.Y. 1997).

The language of 47 U.S.C. § 553(c)(3)(B) provides:

> In any case in which the court finds that the violation was committed willfully and for purposes of commercial advantage or private financial gain, the court in its discretion may increase the award of damages, whether actual or statutory under subparagraph (A), by an amount of not more than $50,000.

In the recent case of *Charter v Burdulis* 367 F.Supp.2d 16, 2005 (D. Mass 2005) the Massachusetts Federal District Court found it could assess additional damages pursuant to 47 U.S.C. § 553(c)(3)(B) if it found the violations of  47 U.S.C. § 553(a) were:

a.   Willful and

b.   For the private financial gain of the defendant. *Charter* at 20.

The *Charter* Court went on to find that it was indeed inherently willful to obtain and

then utilize a descrambler. *Charter* at 22. Such a finding of willfulness should apply to the Defendant's extremely similar activities in this Civil Action. Finally, the Defendant defaulted to an allegation that the actions of the Defendant were willful.

The court in the *Charter* case also found that "An individual's use of a descrambler to obtain cable programming without paying for it constitutes 'private financial gain' within the meaning of the statute, absent usual circumstances not apparently present here." *Charter* at 25. The *Charter* court stated that this reasoning was also followed in the case of *Cablevision v Lokshin*, 980 F. Supp. 107 (E.D.N.Y. 1997).

The *Charter* case was just cited favorably and followed in the case of *Comcast v Doucette* CA NO 03-11779-REK (D. Mass 2005) where the Court assessed additional damages pursuant to 47 U.S.C. § 553(c)(3)(B) where the defendant was using a "homemade black box".

Accordingly the Plaintiff asserts that the Defendant's actions in procuring and utilizing a black box to avoid paying cable television bills were willful and intentional and these actions were done to give the Defendant a private financial gain subjecting him to the additional statutory damages pursuant to 47 U.S.C. § 553(c)(3)(B).

**5.    Conclusion as to Statutory Damages**

Based upon the statute, the arguments and the case law referenced above, statutory damages in this case could be assessed in excess of the $7,000.00 the Plaintiff is seeking.

### III.    <u>Injunctive Relief</u>

Based upon the Defendant's liability as determined by the Default, the Plaintiff is entitled to injunctive relief against the Defendant pursuant to Title 47 U.S.C. § 553 (c) (2)(A)

which provides that the Court:

> "may grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain violations of subsection (a)(1) of this section"

The Plaintiff need not prove irreparable harm for the injunction to issue. Where express authority for issuance of statutory injunctions is provided by legislative enactment, an injunction may issue without resort to the traditional "equitable" prerequisites so long as liability has been established under the statute. See *General Instrument Corp. v. Nu-Tek Electronics & Manufacturing, Inc.*, 3F. Supp 2d 602, 607 (E.D.Pa.1998), aff'd 197F.3d 83 (3d Cir.1999). The terms of the requested injunction are reasonably drafted to thwart any future piracy activities by the Defendant.

### IV.     Attorney's Fees

Pursuant to Title 47 U.S.C. 553(c)(2)(C), the Court should direct the recovery of full costs, including awarding reasonable attorneys fees to an aggrieed party who prevails. The First Circuit follows the "lodestar" approach when awarding attorney's fees pursuant to a Federal statutory authorization. See, *Furtado v. Bishop*, 635 F.2d 915, (1st Cir. 1980). Utilizing the "lodestar" approach, the Court would, in essence, multiply the reasonable number of hours worked by a reasonable hourly rate. Plaintiff's Counsel has filed an Affidavit with this court that would justify an attorney's fees award of **$884.00**

.

### V.     Post-judgment Interest

The Plaintiff is entitled to post-judgment interest accruing on the Judgment pursuant to 28 U.S.C. §1961. Said statute covers post-judgment interest on civil actions brought to judgment in U.S. District Courts.

## VI.    Costs

The Plaintiff is also entitled to costs incurred in this action pursuant to § 553, specifically:

|   |   |   |
|---|---|---|
| a. | Filing Fee ( including fee for out-of-state attorney): | $150.00 |
| b. | Sheriff's Service Fee: | $47.40 |

**TOTAL COSTS:    $197.40**

## VII.    Conclusion

Pursuant to all of the above, the Plaintiff is entitled to a default judgment as follows:

1.  **$7,000.00** in statutory damages pursuant to § 553;

2.  Attorney's and paralegal's fees of **$884.00**

3.  Costs of **$197.40**

4.  The issuance of a permanent injunction pursuant to Title 47 §553 utilizing the following language or language of a similar nature:

> The Court hereby enjoins the Defendant, the Defendant's respective agents, servants, employees, and any person or entity controlled directly or indirectly by the Defendant or acting on the Defendant's behalf from the further modification and/or use of electronic equipment designed for the unauthorized interception of signals in violation of provisions of Title 47;

5.  Post-judgment interest running on the judgment pursuant to 26 U.S.C. § 1961.

Respectfully Submitted for the Plaintiff,
Comcast of Southern New England, Inc.
By Its Attorney,


1/13/2006                          __/s/ John M. McLaughlin__
Date                               John M. McLaughlin
                                   **Green Miles Lipton & Fitz-Gibbon LLP**
                                   77 Pleasant Street
                                   P.O. Box 210
                                   Northampton, MA 01061-0210
                                   Telephone:  (413) 586-0865
                                   BBO No. 556328